IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **CHRISTOPHER MALDONADO,** : | |
|     Plaintiff, : | CIVIL ACTION |
| : | |
| v. : | NO. 22-3823 |
| : | |
| **MICHAEL FISCHER, et al.** : | |
|     Defendants. : | |

### MEMORANDUM OPINION

**Goldberg, J.**                                                                                                                       **AUGUST 19, 2025**

      Plaintiff Chrisopher Maldonado brought this suit against three prison officials, Sgt. Fischer, Sgt. Kreider, and Correctional Officer Hinton, claiming that all three exercised excessive force against him. Plaintiff also alleges that Sgt. Fischer subjected him to cruel and unusual punishment. Defendants now move for summary judgment on all claims. For the reasons explained below, summary judgment will be granted as to Plaintiffs' claim of excessive use of force but denied as to his claim of cruel and unusual punishment against Sgt. Fischer.[1]

### I.    STATEMENT OF FACTS

      The following facts are derived from the evidence submitted by the parties. Where there is conflicting evidence about a particular fact, Federal Rule of Civil Procedure 56 requires that I view such evidence in the light most favorable to Plaintiff.

      Under my policies and procedures, "[t]he papers opposing a motion for summary judgment shall include as a separate exhibit a short and concise statement . . . [that] responds to the numbered paragraphs set forth in the moving party's Statement of Undisputed Facts." Policies and Procedures

---

[1] While Plaintiff claims that Sgt. Fischer violated his Eighth Amendment Rights against cruel and unusual punishment, because he is a pretrial detainee his claim will instead be analyzed under the Fourteenth Amendment's prohibition on confinement that amounts to punishment.

1

at 8–9, https://www.paed.uscourts.gov/judges-info/district-court-judges/mitchell-s-goldberg. Failure to dispute facts will result in those facts being deemed undisputed. Id., see also Fed. R. Civ. Pro. 56(e). However, I will not accept factual assertions that are blatantly contradicted by video. See Scott v. Harris, 550 U.S. 372, 382 (2007) (stating that courts must view the facts in the light depicted by the videotape, not the "visible fiction" that is contained in Plaintiff's Complaint). I will grant summary judgment if the Motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it. Fed. R. Civ. Pro. 56(e).

On February 18, 2025, Defendants filed their Motion for Summary Judgment along with their Statement of Undisputed Material Facts ("DSUF"). (ECF Nos. 149, 150.) On March 7, 2025, I received Plaintiff's "Motion" opposing Summary Judgment. (ECF No. 157.) I will construe Plaintiff's Motion as a response to Defendants' Motion for Summary Judgment. This filing does not include the required response to Defendants' Statement of Undisputed Facts. However, Plaintiff's Response does urge that I "play the video which will paint a different picture to what [he] really endured." (Id.) As such, I will treat Defendants' DSUF as undisputed, unless it is contradicted by the video. I will cite the video evidence where possible.

## II.   FACTUAL AND PROCEDURAL HISTORY[2]

On June 25, 2022, Defendants Sgt. Fischer and Sgt. Kreider responded to a disturbance at Plaintiff Christopher Maldonado's cell, which involved him pushing his bedding into the walkway. (DSUF ¶ 1.) At the time of the incident, Plaintiff was a pretrial detainee. (Maldonado Deposition, 21:4-8.)

---

[2] The following facts are derived from the video evidence submitted by Defendants, and from Defendants' DSUF, which is considered undisputed. I will cite to video evidence when possible, and I will not rely on any statement in the DSUF which is contradicted by video evidence.

Sgt. Fischer told Plaintiff's cellmate to "cuff up," and Plaintiff's cellmate was then safely removed from the cell. (DSUF ¶ 3; Sgt. Fischer Body Camera Video ("Fischer") at 13:56:54–13:57:32.) While removing his cellmate, Sgt. Fischer ordered Plaintiff to the back of his cell, told him not to move, and pointed his taser at Plaintiff. (DSUF ¶ 5; Fischer at 13:57:08–13:57:30.) Sgt. Fischer entered the cell and gave multiple instructions for Plaintiff to get on his knees. (DSUF ¶ 5; Fischer at 13:57:30–13:57:40.)

When Plaintiff eventually complied, Sgts. Fischer and Kreider approached Plaintiff and Sgt. Fischer grabbed Plaintiff's left wrist and holstered his taser while Sgt. Kreider applied a handcuff to Plaintiff's right wrist. (DSUF ¶ 6; Fischer at 13:57:40–13:57:51.) Plaintiff then stood up, called Sgt. Fischer a "b____ a__ n_____," and kicked him. (DSUF ¶ 7; Fischer at 13:57:51–13:57:54.) A physical struggle ensued, and Sgt. Fischer performed a "drive-stun" with his taser. (DSUF ¶¶ 8-9; Fischer at 13:57:51–13:58:04.)

Despite receiving a drive stun, Plaintiff continued to resist. (Id.) While being held back by Sgt. Kreider, Plaintiff charged shoulder first into Sgt. Fischer. (Fischer at 13:58:03.) Sgt. Fischer then ordered Sgt. Kreider to back out, (Fischer at 13:58:05.), and Sgt. Fischer deployed his taser. (Fischer at 13:57:05–13:57:12.) Plaintiff, appearing unaffected by the taser, attempted to use the loose handcuff attached to his right wrist as a weapon, charged Sgt. Fischer, and punched Sgt. Fischer with the cuff. (DSUF ¶¶ 10, 35; Fischer at 13:58:05–13:58:15; Sgt. Kreider Body Camera Video ("Kreider") at 13:58:05–13:58:15.) Defendant Correctional Officer Hinton arrived around this time, attempted to restrain Plaintiff, and delivered three (3) to five (5) closed fist strikes to Plaintiff's head and facial area. (DSUF ¶¶ 11,13; Fischer at 13:58:18.) Plaintiff, Sgt. Fischer, and C.O. Hinton then fell to the ground. (DSUF ¶ 14; Fischer at 13:58:18–13:58:23.) Sgt. Kreider then performed a "drive-stun" with her taser. (DSUF ¶ 15; Kreider at 13:58:27–13:58:33.) Following

3

the drive stun, Plaintiff placed his hands behind his back, and cuffs were applied. (DSUF ¶ 15, Kreider at 13:58:38–13:58:47.)

While Plaintiff was on the ground in handcuffs, C.O. Hinton placed his knee into the neck and shoulder area of Plaintiff. (Fischer at 13:58:52.) Sgt. Fischer's body cam video shows C.O. Hinton's knee on Plaintiff for approximately four seconds before Sgt. Fischer turns, and Hinton is no longer visible. (Id. at 13:58:52–13:58:56.) At 13:59:44, C.O. Hinton is visible on camera, and his knee is not on Plaintiff's neck. (Fischer.) From when C.O. Hinton places his knee on Plaintiff to when C.O. Hinton is seen again on video, Sgt. Fischer is applying shackles to Plaintiff's legs. (Fischer at 13:58:52–13:59:42.) Throughout that period, Plaintiff is communicating with the officers. (Id.) While Plaintiff appears agitated during this time, it is not until around 13:59:41 when he shouts: "I can't breathe." (Fischer.) At that time, Plaintiff is positioned on his side, and C.O. Hinton can be seen approximately three seconds later with his knee away from Plaintiff. (Id. at 13:58:41-13:59:50.)

Sgt. Fischer and C.O. Hinton then bring Plaintiff to his feet before transporting him out of the cell. (Fischer at 14:00:05–14:01:05; Defs' Exhibits I, J, K, L, and M.) Following the incident, Plaintiff refused medical care, and he was placed in cell 1109. (DSUF ¶ 18, 53.) Once in cell 1109, Sgt. Kreider took photographs of Plaintiff's alleged injuries. (Id.; Kreider at 14:26:16.) On June 26, 2022, Plaintiff reported pain and bruising in his right toe. (DSUF ¶¶ 54–55.) On June 27, 2022, Plaintiff reported a headache, which he attributed to "hitting head on bars." (DSUF ¶ 56.)

Cell 1109, where Plaintiff was housed for approximately 22 days following the incident, contained lighting that remained on twenty-four hours a day. (DSUF ¶ 45-52.) The intensity of the lighting in Cell 1109 was 3500 lumens or 82 foot-candles. (Id.) While in cell 1109, Plaintiff continued to make threats against Sgt. Fischer. (DSUF ¶ 50.)

### III.   STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 states, in pertinent part:

> A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law. The court should state the reasons for granting or denying the motion on the record.

Fed. R. Civ. P. 56(a). "Through summary adjudication, the court may dispose of those claims that do not present a 'genuine dispute as to any material fact' and for which a jury trial would be an empty and unnecessary formality." Capitol Presort Servs., LLC v. XL Health Corp., 175 F. Supp. 3d 430, 433 (M.D. Pa. 2016). A factual dispute is "material" if it might affect the outcome of the suit under the applicable law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue is "genuine" only if there is a sufficient evidentiary basis that would allow a reasonable fact-finder to return a verdict for the non-moving party. Id.

Summary judgment is appropriate against a party that "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317 (1986). The initial burden is on the moving party to adduce evidence illustrating a lack of genuine, triable issues. Hugh v. Butler Cnty. Family YMCA, 418 F.3d 265, 267 (3d Cir. 2005). Once the moving party satisfies its burden, the non-moving party must, in rebuttal, present sufficient evidence of a genuine issue. Santini v. Fuentes, 795 F.3d 410, 416 (3d Cir. 2015). The court must then resolve all doubts as to the existence of a genuine issue of material fact in favor of the non-moving party. Saldana v. Kmart Corp, 260 F.3d 228, 232 (3d Cir. 2001). There must be more than a scintilla of evidence supporting the non-moving party and more than some metaphysical doubt as to the material facts. Id. at 252.

Moreover, "a party resisting a [Rule 56] motion cannot expect to rely merely upon bare assertions, conclusory allegations or suspicions." Gans v. Mundy, 762 F.2d 338, 341 (3d Cir. 1985) (citing Ness v. Marshall, 660 F.2d 517, 519 (3d Cir. 1981)).

"[I]n order to survive a summary judgment motion in which the movant argues that there is an absence to support her case, the plaintiff must point to some evidence beyond her raw claim. . . ." Singletary v. Pa. Dep't of Corr., 266 F.3d 186, 192 n.2 (3d Cir. 2001) (citing Celotex, 477 U.S. at 325). "[O]n a motion for summary judgment, a *pro se* plaintiff is not relieved of his obligation under Rule 56 to point to competent evidence in the record that is capable of refuting a defendant's motion for summary judgment." Edwards v. Rice-Smith, 606 F. Supp. 3d 151, 154 (E.D. Pa. 2022) (quoting Dawson v. Cook, 238 F. Supp. 3d 712, 717 (E.D. Pa. 2017)). "The party opposing summary judgment, whether *pro se* or counseled, must present evidence, through affidavits, depositions, or admissions on file, to show that there is a genuine issue for trial." Id. (quoting Watson v. Philadelphia Hous. Auth., 629 F. Supp. 2d 481, 485 (E.D. Pa. 2009)).

"When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380 (2007).

## IV. DISCUSSION

### A. Excessive Force

"[T]he Fourteenth Amendment protects pretrial detainees from 'the use of excessive force that amounts to punishment.'" Jacobs v. Cumberland Cty., 8 F.4th 187, 194 (3d. Cir. 2021) (quoting Graham v. Connor, 490 U.S. 386, 395 n.10 (1989)). "[A] pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." Jacobs, 8

6

F.4th at 194 (quoting Graham v. Connor, 490 U.S. at 396-97). "[O]bjective reasonableness turns on the 'facts and circumstances of each particular case.'" Kingsley v. Hendrickson, 576 U.S. 389, 397 (2015). A fact-finder must make this determination "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." Id. They "must also account for the legitimate interests that stem from the government's need to manage the facility in which the individual is detained, appropriately deferring to policies and practices that in the judgment of jail officials are needed to preserve internal order and discipline and to maintain institutional security." Id. (internal quotations omitted). A court will dismiss a case on summary judgment if, upon viewing the video, a reasonable jury would have to conclude that the use of force was reasonable under the circumstances. See Tindell v. Beard, 351 Fed. Appx. 591, 596 (3d. Cir. 2009).

The Supreme Court identified the following non-exclusive list of considerations that may bear on the reasonableness of the force used: (1) the relationship between the need for the use of force and the amount of force used; (2) the extent of the plaintiff's injury; (3) any effort made by the officer to temper or to limit the amount of force; (4) the severity of the security problem at issue; (5) the threat reasonably perceived by the officer; and (6) whether the plaintiff was actively resisting. Kingsley, 576 U.S. at 397 (internal quotations omitted).

Applying the Kingsley factors, no juror would find that any of the Defendants subjected Plaintiff to objectively unreasonable force under the circumstances.

### 1. Sgt. Fischer

The undisputed facts reflect that Sgt. Fischer initially pointed a taser at Plaintiff and ordered him to his knees. Sgt. Fischer then placed his hand on Plaintiff's wrist to apply handcuffs. Plaintiff

has not identified any authority for the proposition that the threat of non-deadly force in obtaining compliance from a subject is excessive. See Ippolito v. Aherne, 2015 U.S. Dist. LEXIS 144710, *16 (E.D. Pa. 2015) ("[I]t cannot be said that using the threat of non-deadly force in the form of a Taser was 'clearly unlawful.'"). Sgt. Fischer's use of force after Plaintiff became aggressive is likewise not objectively unreasonable under Kingsley.

First, any reasonable juror would find that the amount of force used was reasonable in relation to the need presented by Plaintiff. Specifically, Sgt. Fischer was responding to Plaintiff, who had kicked, punched, and charged him. Furthermore, Plaintiff's aggressive behavior continued after being tased. Even with Sgt. Kreider holding him back, Plaintiff was able to lunge shoulder-first at Sgt. Fischer. After being tased a second time, Plaintiff assumed a fighting stance and struck Sgt. Fischer using an open handcuff as a weapon.

Even while being physically attacked, Sgt. Fischer attempted to use his taser to gain control of Plaintiff. As this court has previously stated, a taser "is considered to inflict considerably less pain…than other forms of force." McNeil v. City of Easton, 694 F. Supp. 2d 375, 393 (E.D. Pa. 2010) (internal quotation omitted). As such, federal district courts in the Third Circuit have found the use of a taser to overcome a suspect's resistance to be reasonable. Id. It is also not unreasonable for an officer to use his taser a second time when the subject continues to mount resistance. Id. In view of the undisputed evidence, the need for force was high, and the amount of force used was comparatively low. As such, the first factor cuts heavily in favor of Sgt. Fischer's use of force being reasonable.

Second, Plaintiff received only minor injuries. Pictures and video taken after the incident show only a small laceration from the use of the taser. Additional medical records report only pain

8

and bruising to various areas of his body, with no evidence showing that Plaintiff sustained major injuries. As such, the second factor weighs in favor of Sgt. Fischer's use of force being reasonable.

Third, the undisputed facts reflect that Sgt. Fischer did what he could to limit the amount of force employed against Plaintiff. Specifically, he attempted to secure Plaintiff by performing a drive stun, which as stated is a lessor use of force. Given Plaintiff's aggressive acts, it is unclear what more Sgt. Fischer could have done to temper the amount of force that was used. As such, the third factor cuts in favor of Sgt. Fischer's use of force being reasonable.

Fourth, the undisputed facts reflect that the severity of the security problem was high. As previously stated, Sgt. Fischer was forced to respond to Plaintiff's aggressive behavior. During the interaction, Plaintiff attempted to use handcuffs as a weapon against Sgt. Fischer, and taser deployment was unsuccessful in stopping him. This could have placed Sgt. Fischer in a reasonable fear for his safety and the safety of his colleague. As such, the fourth factor indicates that Sgt. Fischer's use of force was reasonable.

Fifth, Sgt. Fischer reasonably perceived that Plaintiff created a threat. Plaintiff was aggressive, was attempting to use a handcuff as a weapon, and the use of a taser had been ineffective. As such, the fifth factor supports Sgt. Fischer's use of force being reasonable.

Finally, it is undisputed that Plaintiff was actively resisting, such that the sixth factor supports Sgt. Fischer's use of force being reasonable.

Applying the <u>Kingsley</u> factors, I conclude no juror could find that Sgt. Fischer's actions were objectively unreasonable. As such, summary judgment is appropriate as to Sgt. Fischer's use of force in restraining Plaintiff.

9

### 2. *Sgt. Kreider*

Plaintiff's main complaint against Sgt. Kreider is that she used a drive stun after Plaintiff was already on the ground being restrained. Plaintiff states he was "tased for 9 straight seconds or more while [he] was face down and cuffed up from behind . . . ." (ECF No. 157.) However, the video Plaintiff relies upon clearly refutes Plaintiff's account. In the video, Sgt. Kreider is heard deploying a drive stun from approximately 13:58:27 to 13:58:33, at which point she tells Plaintiff to put his hands behind his back. Plaintiff then places his hands behind his back at approximately 13:58:38, and is subsequently secured in handcuffs. (ECF No. 149, Ex. B.) The video also reflects that when Sgt. Kreider deployed a drive stun, Plaintiff was actively resisting and had continuously ignored orders from Sgts. Fischer and Kreider. Courts have previously found similar actions to be reasonable. See Wargo v. Municipality of Monroeville, 646 F. Supp. 2d 777, 787 (W.D. Pa, 2009) ("[I]t would not be deemed unreasonable for Pascarella to have used his taser a second time when Wargo mounted his last act of resistance by refusing to assume a position that allowed for his arrest."); see also Brown v. Rinehart, 325 Fed. Appx. 47 (3d Cir. 2009) (affirming district court grant of summary judgment when police employed a "stun blow" to suspect's head after initial pepper spray in the eyes did not allow officers to gain control over him); Stanley v. City of Baytown, 2005 U.S. Dist. LEXIS 48504 (S.D. Tex. 2005) (holding Defendant's use of taser not objectively unreasonable when Plaintiff continually thrashed and refused to obey orders, even though Plaintiff was partially-restrained on a stretcher and about to be loaded into an ambulance). As such, Sgt. Kreider's use of a drive stun on Plaintiff was not objectively unreasonable.

Applying the Kingsley factors independently supports this conclusion. The analysis under Kingsley is nearly identical for Sgts. Kreider and Fischer. While Plaintiff's threat level may have been reduced by being taken to the ground, it is undisputed that he was still actively resisting and

10

had just struck Kreider's colleague. Additionally, Sgt. Kreider's use of the drive stun resulted in no identifiable injury, unlike the laceration from Sgt. Fischer's taser deployment. As such, the undisputed facts indicate that no reasonable juror could find Sgt. Kreider's use of force was objectively unreasonable.

### 3. C.O. Hinton

The undisputed facts reflect that C.O. Hinton did not deploy a taser, but instead struck the Plaintiff in the head with his fist. Nonetheless, given the circumstances, applying the Kingsley factors demonstrates that no reasonable juror would find that C.O. Hinton's use of force was unreasonable.

C.O. Hinton appeared on video for the first time at approximately 13:58:17. This was after Plaintiff was already tased, and in an active struggle with Sgt. Fischer. As such, Kingsley factors four through six support a finding that C.O. Hinton's use of force was reasonable. As to the first and third factors, while C.O. Hinton's strikes were a greater exercise of force then a taser, no reasonable juror could conclude that Hinton's conduct was disproportionate to the threat posed by Plaintiff. C.O. Hinton would have been aware that taser deployment was ineffective, two officers had struggled to gain control of Plaintiff, and Plaintiff was actively fighting Sgt. Fischer. As such, his strikes appeared to be no more than necessary to respond to the situation. Additionally, C.O. Hinton was given no time to assess the situation to temper his response.

As to the second factor, Plaintiff showed no physical signs of C.O. Hinton's strikes after the incident. While he later complained of a headache, he was not bleeding, and no swelling was observed when pictures and video were taken post-incident. Applying the Kingsley factors, no

reasonable juror would find that C.O. Hinton's use of force was objectively unreasonable under the circumstances.

Plaintiff also accuses C.O. Hinton of "plac[ing] [his] knee on [Plaintiff's] neck and pulling [his] hair." (ECF No. 157.) Placing one's bodyweight on a prone person for a prolonged period of time could constitute a severe use of force, causing significant pain, restricting the ability to breathe, and creating a risk of asphyxiation, which could result in a finding of excessive force. See Riley v. Clark, 2025 U.S. Dist. LEXIS 61626, *29 (M.D. Pa. March 31, 2025). However, there is insufficient evidence for a reasonable juror to find that C.O. Hinton's placement of his knee was an excessive use of force.

Plaintiff has failed to allege, much less present evidence, that C.O. Hinton placed his knee on Plaintiff's neck for a prolonged period. Body Camera footage shows only three to four seconds of Defendant Hinton's knee on Plaintiff's neck. This occurred while Plaintiff was resisting, and Sgts. Fischer and Kreider were attempting to place Plaintiff in restraints. "Generally the application of [shackles] satisfies legitimate police and safety concerns," especially when a detainee is actively resisting. Id. at *28. To accomplish these legitimate aims when faced with a pretrial detainee who is nonresponsive to verbal commands and continually resisting, taking him to the ground and holding him in a prone position is reasonable. Id.

Additionally, there is no evidence that Hinton's knee placement caused significant pain, restricted Plaintiff's ability to breathe, or created a risk of asphyxiation. During the brief period where C.O. Hinton's knee can be seen on Plaintiff's neck, and for the time immediately after, Plaintiff is talking and is not complaining of any pain or an inability to breathe. At approximately 13:59:42, Plaintiff shouts that he can't breathe. At this point, Plaintiff is positioned on his side, and at 13:59:45, the Fischer's body camera video confirms that C.O. Hinton's knee is not on Plaintiff's

12

neck. Viewing this video evidence, even in the light most favorable to Plaintiff, no reasonable juror could find that C.O. Hinton's use of force was objectively unreasonable under the circumstances.

### 4. *Transport to the Restrictive Housing Unit*[3]

In his Motion Opposing Summary Judgment, Plaintiff takes issued with "what was done to [him] while the escort slamming me into cell doors." (ECF No. 157.) While the video does demonstrate that Plaintiff did make contact with doors and walls during transport, no reasonable juror could find that this was the result of an objectively unreasonable amount of force. The video reflects that Plaintiff was continuing to resist while Defendants attempted to transport him, and it appears that Plaintiff's contact was an incident of his continued resistance. Plaintiff made no assertion of any injury resulting from his transport. While Plaintiff's threat level was low during his transport, the force used to transport him was similarly low. As court's have explained, "'not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' violates an inmate's constitutional rights." Jacobs, 8 F.4th 187, 195 (citing Hudson v. McMillian, 503 U.S. 1, 9 (1992)). Here, the video evidence supports only one conclusion: that Plaintiff was not subject to an objectively unreasonable amount force during his transport to the Restrictive Housing Unit, and as such, summary judgment is appropriate on this issue.

---

[3] Plaintiff has filed a Motion to "[t]o depose C.O. Elyizer Ortiz due to him witnessing Sgt. Michael Fischer using excessive force during the [e]scort to the G-2 RNU unit." (ECF No. 126.) However, the Parties have provided both Sgt. Fischer's body cam footage of the escort and overhead security camera footage of Plaintiff's entire transport. As the video evidence is complete, a deposition of C.O. Elyizer Ortiz can only serve to produce duplicative evidence.

### 5. *Shackling*

Plaintiff also alleges that he was shackled too tightly. However, no reasonable juror could find that Plaintiff's constitutional rights were violated due to his being shackled.

"In determining whether plaintiff's allegation that he was shackled 'too tightly' amounts to a constitutional deprivation, . . . a court must look to such factors as the need for the application of force, the relationship between the need and the amount of force that was used, the extent of injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." Brightwell v. Smarkola, 1988 U.S. Dist. LEXIS 13002, *3-4 (citing Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973), cert. denied, 414 U.S. 1033 (1973)). In Brightwell, the court dismissed as frivolous a plaintiff's complaint that he was shackled too tightly where: (1) there was a security need to shackle the plaintiff, and (2) the plaintiff provided only his unsupported, self-serving statement of injury. Id.

Here, it is undisputed that Plaintiff had actively resisted and fought prison officials, thereby demonstrating a need to secure him. As previously discussed, that need was high given Plaintiff's aggressive actions towards Sgt. Fischer. Defendants also point out that the Plaintiff did not complain that his shackles were too tight at the time they were applied, or shortly after, which indicates that the amount of force applied was comparatively low. After the incident, Plaintiff was checked out by Sgt. Kreider but did not complain of injuries related to shackling, despite discussion of other alleged injuries. (Kreider at 14:26:00–14:27:42.) Finally, there is no evidence to suggest that Defendants had a malicious reason for shackling Plaintiff. As such, no reasonable juror could find that Plaintiff's constitutional rights were violated by being shackled, and summary judgment is appropriate on this issue.

### B. **Conditions That Amount to Punishment**

Plaintiff claims that Defendant Fischer's action in housing him in room 1109, where "[t]he light never was able to be turned off," amounted to cruel and unusual punishment.[4] (See 22-cv-4309, Compl. at 4.) Defendant Fischer cites multiple cases that have "found continuous lighting inside a prison cell to *not* be a constitutional violation." ECF No. 150-1 at 26 (citing Stewart v. Beard, No. 3:07-CV-1916, 2010 U.S. Dist. LEXIS 77081, at *8 (M.D. Pa. July 30, 2010), aff'd on other grounds, 417 F. App'x 117 (3d Cir. 2011)). However, Stewart specifically declined to find, as a matter of law, that continuous lighting is not a constitutional violation. 2010 U.S. Dist. LEXIS 77081 at *2. Instead, it specifically relied on facts such as: (1) the light was low intensity in nature, (2) prison officials were concerned with aggressive conduct on the part of Plaintiffs which included the throwing or squirting of body fluids and body waste at staff members, and (3) Plaintiffs could avoid the effects of the lighting by covering their eyes with a pillow, a pillow case or the like. Id.

The facts supporting Stewart's holding are not present at this stage of the litigation. While, Defendants claim that the light was low intensity, but a reasonable juror could certainly reject that assertion. The light to which the Plaintiff was subjected, 3500 lumens or 82 foot-candles, was substantially brighter than what the Plaintiff complained of in Stewart, a light of 600 lumens or 2 foot-candles.[5] That is anywhere from six to forty-one times brighter. Moreover, the lighting in

---

[4]     Under the Eighth Amendment, prisoners must not be subject to "cruel and unusual punishment." Plaintiff, who is not a prisoner, is entitled to protection under the Fourteenth Amendment's Due Process Clause, which prevents pretrial detainees from being subjected to conditions that amount to punishment. Hubbard v. Taylor, 538 F.3d 229, 231 (3d Cir. 2008) (citing Bell v. Wolfish, 441 U.S. 520, 535, (1979)). While Defendants acknowledge the correct standard, they rely on law applying the Eighth Amendment, arguing that the Third Circuit has previously borrowed from Eighth Amendment Cases in applying the Fourteenth Amendment. I do not address this assertion as summary judgment is inappropriate under the Eighth Amendment's lower level of protection. It naturally follows that summary judgment is inappropriate under the level of protection provided by the Fourteenth Amendment.

[5]     A lumen is a metric unit of measure used to measure the rate at which light energy falls on a surface. Barrow, Bruce B., Metric system, World Book Online InfoFinder, World Book (2010). Because

room 1109 can be seen in Sgt. Kreider's body camera footage. (See Kreider at 14:26:15–14:27:30.) Assuming that is the light at issue, I decline to find as a matter of law, that the light was of low intensity – this is a fact issue. Additionally, a juror that rejects Defendant's characterization of the light as low-intensity may also question the effectiveness of Plaintiff covering their eyes with a pillow.

While Defendants assert that they were concerned about aggressive behavior, a juror may question whether the lighting used was warranted. Unlike Stewart, there is no stated concern of Plaintiff throwing or squirting body fluids. Yet, even if that was a concern, Defendants fail to explain how keeping Plaintiff in a cell was insufficient to address said concern. Sgt. Kreider's video shows that Cell 1109 has a solid door which would prevent Plaintiff from posing a threat once inside. Defendants state a concern over Plaintiff hiding in the dark, but do not explain why they could not have simply turned the lights on before entering his cell. Given all of these factors, a reasonable juror could reject Defendants position that a continuous 82 foot-candle light achieved a legitimate penological concern.

Nonetheless, Defendant Fischer argues that even if their actions resulted in a constitutional violation, they are entitled to Qualified Immunity on this issue.

The doctrine of qualified immunity shields public officials performing discretionary functions from liability insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Harvey v. Plains Twp. Police Dep't, 421 F.3d 185, 192 (3d Cir. 2005). To determine if Defendants are entitled to claim

---

bulbs using the same wattage can give off differing levels of illumination, light bulbs are also rated in terms of the number of lumens they produce. Id. A foot-candle is a unit for measuring the illumination of an area in the inch-pound system customarily used in the United States. Helms, Ronald N., Foot-candle, World Book Online InfoFinder, World Book (2010).

qualified immunity, the Third Circuit has adopted a three-part test: "(1) whether the [Plaintiff] alleged a violation of their constitutional rights; (2) whether the right alleged to have been violated was clearly established in the existing law at the time of the violation; and (3) whether a reasonable official knew or should have known that the alleged action violated [Plaintiff's] rights." Rouse v. Plantier, 182 F.3d 192, 196–98 (3d Cir. 1999).

It is clearly established that the Eighth Amendment "prohibits punishments which, although not physically barbarous, involve the unnecessary and wanton infliction of pain." Rhodes v. Chapman, 452 U.S. 337, 346 (1981) (internal quotations omitted). Included among unnecessary and wanton inflictions of pain are those punishments completely without penological justification. Id. Courts have held that causing inmates to suffer physical and psychological harm by living in constant illumination is without penological justification. Sims v. Piazza, 462 Fed. Appx. 228, 232 (3d. Cir. 2012).

While it is true that some courts have held that continuous exposure to low wattage night time security lighting may be permissible based on legitimate penological interests, E.g., Spencer v. Wetzel, 2013 U.S. Dist. LEXIS 186123, *11, these cases do not apply here because at minimum there is a question of fact as to whether: (1) the lighting was of the low intensity discussed in those cases, and (2) Defendants had a legitimate penological interest for their actions.

Defendants have not put forward any authority that suggest that lighting of the intensity found in Room 1109 was constitutionally permissible. See Spencer, 2013 U.S. Dist. LEXIS 186123, *3 (Explaining that "each cell in the RHU contains a light fixture with two 28 watt fluorescent light bulbs and one nine watt fluorescent bulb," the lower power security light was fitted with an opaque panel, and only the lower powered security light stayed on 24 hours a day);

17

Stewart, 2010 U.S. Dist. LEXIS 77081 at *8 (involving a 600 lumen or 2 foot-candles light source). Additionally, Defendant Fischer's asserted penological interest could be rejected by a jury.

Viewing the facts in the light most favorable to Plaintiff, I find that there are material issues of fact as to whether Defendant Fischer violated Plaintiff's due process rights. Additionally, if Defendant Fischer did violate Plaintiff's constitutional rights, then he would not be entitled to qualified immunity, as these rights were clearly established at the time of the violation. As such, Defendant Fischer is not entitled to qualified immunity.

### C. Deliberate Indifference

To the extent that Plaintiff is making out a claim of deliberate indifference, asserting that Sgt. Kreider was aware that Sgt. Fischer had previously assaulted Plaintiff; he has provided no evidence to substantiate that argument. There is no evidence of a prior assault on Plaintiff, nor is there any evidence that Sgt. Kreider was aware of such an assault. As such, summary judgment will be entered on this issue.

### D. State Law Tort Claims

Defendants also move for summary judgment on the issues of assault, battery, gross negligence, and intentional infliction of emotional distress. They argue, *inter alia*, that such claims are barred by the Pennsylvania Political Subdivision Tort Claims Act ("PSTCA"), 42 Pa. Cons. Stat § 8541. That act states that "no local agency shall be liable for any damages on account of any injury to a person or property caused by any act of the local agency or an employee thereof or any other person." Id. While there are exceptions to this government immunity, none are relevant here. See 42 Pa. Cons. Stat § 8542(a)(2). Those exceptions specifically do not apply to acts that constitute "crimes, actual fraud, actual malice or willful misconduct." Id. Intentional torts are

"willful misconduct" under Section 8542(a), meaning a local agency cannot be liable for claims of assault, battery, or intentional infliction of emotional distress. Pollarine v. Boyer, 2005 U.S. Dist. LEXIS 15425, *8-9 (E.D. Pa. 2005). As to Plaintiff's claim of gross negligence, the claim must fall within one of the exceptions to government immunity set forth in § 8542(b).[6] Plaintiff has not addressed Defendants' assertion of immunity, and I have identified no applicable exception. As such, summary judgment will be entered as to Plaintiff's state law tort claims.

In conclusion, Defendants' Motion will be denied as to Plaintiff's claim that by confining him in a cell with 24-hour lighting, Defendant Fischer violated his Fourteenth Amendment rights. Defendants' Motion will be granted on all other issues. An appropriate order follows.

---

[6] The nine exceptions are: (1) vehicle liability; (2) care, custody or control of personal property; (3) real property; (4) trees, traffic controls and street lighting; (5) utility service facilities; (6) streets; (7) sidewalks; (8) care, custody and control of animals, and (9) sexual abuse.

19